# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 15-1500

———————————————

## NUEVA ESPERANZA, INC.

*Appellant*,

v.

## FEDERAL COMMUNICATIONS COMMISSION

*Appellee.*

———————————————

Appeal from the Federal Communications Commission

———————————————

## OPENING BRIEF OF APPELLANT NUEVA ESPERANZA, INC.

MATTHEW S. HELLMAN
JOHN L. FLYNN
DEVI M. RAO
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Washington, D.C. 20001
(v) (202) 639-6000
(f) (202) 639-6066
MHellman@jenner.com
JFlynn@jenner.com
DRao@jenner.com

April 29, 2016                          *Counsel for Nueva Esperanza, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1.** *Parties and Amici.*

The following were parties in the proceeding before the Federal Communications Commission (FCC):

    a.  Nueva Esperanza, Inc.

    b.  NAACP Social Justice Law Project;

    c.  Historic Germantown Preserved;

    d.  G-Town Radio;

    e.  Germantown United Community Development Corporation;

    f.  Germantown Life Enrichment Center; and

    g.  South Philadelphia Rainbow Committee Community Center, Inc.

Nueva Esperanza, Inc. is the appellant before this Court and the FCC is the appellee.  On February 17, 2016, this Court granted the motion for leave to intervene of G-Town Radio, Germantown Life Enrichment Center, and Germantown United Community Development Corporation.

**2.**  *Ruling Under Review.*

The ruling under review in this proceeding is *In re LPFM MX Group 304, NAACP Social Justice Law Project, et al., Application for a Construction Permit for a New LPFM Station at Philadelphia, Pennsylvania*, Memorandum Opinion and Order, 30 FCC Rcd 13,983 (2015).

i

**3. *Related Cases.***

There are no related cases to the above-captioned case.

April 29, 2016                          Respectfully submitted,

                                        /s/ Matthew S. Hellman
                                        MATTHEW S. HELLMAN
                                        JOHN L. FLYNN
                                        DEVI M. RAO
                                        JENNER & BLOCK LLP
                                        1099 New York Avenue, N.W.
                                        Suite 900
                                        Washington, D.C. 20001
                                        (v) (202) 639-6000
                                        (f) (202) 639-6066
                                        MHellman@jenner.com
                                        JFlynn@jenner.com
                                        DRao@jenner.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Nueva Esperanza, Inc. hereby states that it is a nonprofit corporation that does not have a parent company and is not owned in any part by a publicly held corporation.

*/s/* Matthew S. Hellman
Matthew S. Hellman
*Counsel for Nueva Esperanza, Inc.*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF AUTHORITIES ................................................vi

GLOSSARY...............................................................x

JURISDICTIONAL STATEMENT ........................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................2

PERTINENT STATUTES AND REGULATIONS .................................2

FACTS AND PROCEDURAL HISTORY ...............................4

I.      Low Power FM Radio Licenses ......................................4

II.     The LPFM Applications and Media Board Proceeding .................7

III.    The FCC's Order Under Review ..................................12

STANDARD OF REVIEW ..............................................13

SUMMARY OF ARGUMENT ............................................14

STANDING .........................................................18

ARGUMENT ........................................................18

I.      The Text, Structure, and Purpose of the FCC Statement All Clearly
        Establish That It Prohibits the Germantown Applicants' Pre-Award
        Collusion to Share Points. ..........................................18

        A.      The FCC Statement Expressly Prohibits the Conduct At Issue..........18

        B.      The Commission's Interpretation of the FCC Statement Is
                Irrational. .........................................................20

        C.      Esperanza's Interpretation Is the Only One that Makes Sense of
                The Regulatory Scheme. ..................................24

II.     The FCC Statement Was Authoritative and Binding and Esperanza Was Entitled to Rely on It. ..........................................................................28

III.    To the Extent the Commission's Interpretation is Correct, the Commission Failed to Provide Esperanza With Fair Notice........................37

CONCLUSION ........................................................................................40

# TABLE OF AUTHORITIES[*]

CASES

*Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ..................................................................33, 34

*\*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ......29, 31, 33, 36

*Ass'n of American Railroads v. Department of Transportation*, 198 F.3d 944 (D.C. Cir. 1999) ..................................................................................35

*\*CropLife America v. EPA*, 329 F.3d 876 (D.C. Cir. 2003) ........................29, 31, 35

*Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030 (D.C. Cir. 2008) ...................32

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002) .....................................................13, 20

*\*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) .............17, 28, 29, 31

*General Electric Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ...........................37, 38

*Malkan FM Associates v. FCC*, 935 F.2d 1313 (D.C. Cir. 1991) ...........................34

*MetWest Inc. v. Secretary of Labor*, 560 F.3d 506 (D.C. Cir. 2009).......................31

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)...........................23

*Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), *overruled by Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ........................................................................................33

*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ...............................13, 33

*Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987).......................38, 39

*Select Specialty Hospital-Bloomington, Inc. v. Burwell*, 757 F.3d 308 (D.C. Cir. 2014) ..................................................................................14

---

[*] Authorities upon which we chiefly rely are marked with asterisk.

STATUTES

5 U.S.C. § 706(2)(A)...................................................................13

47 U.S.C. § 307 ...........................................................................1

47 U.S.C. § 308 ...........................................................................1

47 U.S.C. § 309 ...........................................................................1

47 U.S.C. § 402(b) .......................................................................1

47 U.S.C. § 402(c) ....................................................................1-2

ADMINISTRATIVE RULINGS

*In re Application of Oregon Acting By and Through the State Board of Higher Education for the Benefit of Southern Oregon State College*, Memorandum Opinion and Order, 11 FCC Rcd 1843 (1996).......................................................................34

*In re Applications of Steven Heft*, Hearing Designation Order, 3 FCC Rcd 6692 (Video Servs. Div. 1998)....................................33

*Commission Identifies Tentative Selectees in 111 Groups of Mutually Exclusive Applications Filed in the LPFM Window; Announces a 30-Day Petition to Deny Period and a 90-Day Period to File Voluntary Time-Share Proposals and Major Change Amendments*, Public Notice, 29 FCC Rcd 10,847 (2014)........................................7, 8, 26, 27

*In re Creation of a Low Power Radio Service*, Fifth Order on Reconsideration and Sixth Report and Order, 27 FCC Rcd 15,402 (2012).......................................................................25

*In re Creation of Low Power Radio Service*, Report and Order, 15 FCC Rcd 2205 (2000).....................................................4, 27

*Media Bureau Identifies Mutually Exclusive Applications Filed in the LPFM Window and Announces 60-Day Settlement Period; CDBS Is Now Accepting Form 318 Amendments*, Public Notice, 28 FCC Rcd 16,713 (2013) ...................................................4, 5, 7, 26

*Media Bureau Provides Further Guidance on the Processing of Form 318 Applications Filed in the LPFM Window*, Public Notice, 28 FCC Rcd 16,366 (2013) ........................................................6

*In re Petition for Declaratory Ruling Concerning Section 312(a)(7) of Communications Act*, Memorandum Opinion and Order, 9 FCC Rcd 7638 (1994), *vacated on other grounds, Becker v. FCC*, 95 F.3d 75 (D.C. Cir. 1996) ........................................................34

**OTHER AUTHORITIES**

47 C.F.R. § 0.61 ........................................................4, 32

47 C.F.R. § 0.61(b) ........................................................32

47 C.F.R. § 0.283 ........................................................4

47 C.F.R. § 73.853(a) ........................................................4

47 C.F.R. § 73.853(b) ........................................................4

47 C.F.R. § 73.870(b) ........................................................4

47 C.F.R. § 73.872(b) ........................................................5

47 C.F.R. § 73.872(c) ........................................................6, 24

47 C.F.R. § 73.872(d) ........................................................6

47 C.F.R. § 73.872(d)(2) ........................................................6

47 C.F.R. § 73.872(d)(3) ........................................................6

47 C.F.R. § 73.3520 ........................................................3, 8, 16, 24

Instructions for FCC Form 318, https://transition.fcc.gov/Forms/ Form318/318.pdf ........................................................24

*Bill Lake, *The Low Power FM Application Window is Fast Approaching*, Official FCC Blog, Sept. 19, 2013, 15:58 EST, https:www.fcc.gov/blog/low-power-fm-application-window-fast-approaching, as updated by Bill Lake, *Updated: The Lower Power FM Application Window is Fast Approaching*, Oct. 21, 2013, 15:13 EST, https://www.fcc.gov/news-events/blog/2013/10/21/updated-low-power-fm-application-window-fast-approaching ...........................................2, 11, 14-15, 19, 21, 30-32

Media Bureau organizational chart, https://transition.fcc.gov/mb/mborg.pdf (Mar. 29, 2016) ................................................................................32

# GLOSSARY

LPFM:        Low Power FM

MX:          Mutually Exclusive

## JURISDICTIONAL STATEMENT

This appeal arises from the Federal Communications Commission's (FCC or "Commission") December 3, 2015 dismissal of Nueva Esperanza, Inc.'s (Esperanza) application for review seeking Commission review of a Media Bureau decision.  That decision denied reconsideration and affirmed the dismissal of Esperanza's application after the Media Bureau granted competing applications for a construction permit for a Low Power FM (LPFM) radio station in Philadelphia, Pennsylvania.

This case turns on the proper interpretation of an FCC Statement that "multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with a prior understanding that the groups will later share time or ownership with each other."  In denying Esperanza's application for review, the Commission held that (1) neither Commission rules nor the FCC Statement prohibited the conduct by the other entities that Esperanza complained of; and (2) the FCC Statement represented informal staff advice that was not authoritative.

The FCC had jurisdiction over this license application under 47 U.S.C. §§ 307-309, and this Court has jurisdiction over this appeal under 47 U.S.C. § 402(b).  Esperanza filed a timely notice of appeal on December 30, 2015.  *See* 47

U.S.C. § 402(c).  This appeal is from a final order or judgment that disposes of all the parties' claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the Commission's interpretation of its Statement is plainly erroneous and unsupported by the text.

2. Whether that Statement was authoritative and binding and, as such, Esperanza had reason to rely on it.

3. Whether, to the extent the Commission's interpretation of the Statement is correct, the Commission failed to provide Esperanza with fair notice of its rules.

## PERTINENT STATUTES AND REGULATIONS

Excerpts from Bill Lake, *The Low Power FM Application Window is Fast Approaching*, Official FCC Blog, Sept. 19, 2013, 15:58 EST, https:www.fcc.gov/blog/low-power-fm-application-window-fast-approaching,  as updated by Bill Lake, *Updated:  The Lower Power FM Application Window is Fast Approaching*, Oct. 21, 2013, 15:13 EST, https://www.fcc.gov/news-events/blog/2013/10/21/updated-low-power-fm-application-window-fast-approaching ("FCC Statement" or "Statement").[1]  The entire document can be found at JA 16-18.

### Updated: The Low Power FM Application Window Is Fast

October 21, 2013—3:13 p.m.
By Bill Lake, Chief, Media Bureau
. . .

---

[1] In a joint stipulation to supplement the record, filed April 14, 2016, the parties stipulated that the text of the October 21 "updated" blog post is an accurate representation of the contents of the document at all relevant times.

Third, we will permit organizations in a community to work together to file a single Form 318 application. Alternatively, organizations in a community could apply separately—for the same or different frequency—knowing that they may decide later to aggregate points so they can negotiate a time-share agreement if the Commission determines that they are tied with the highest point total in the same mutually exclusive group. (Applications are mutually exclusive if they are filed in the same window and the simultaneous operation of the proposed stations would result in one, or more, stations causing objectionable interference to another.)

Fourth, please bear in mind that it is the *specified* applicant on the application who must intend to carry out the station construction and operation described in the application. Therefore, multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with a prior understanding that the groups will later share time or ownership with each other if just one applicant succeeds in getting a construction permit. If this prior understanding does exist, then all the applicants must be listed as parties to the application, and only one application can be filed (our rules only allow for one application per organization). The FCC requires applicants to be truthful when listing all the parties that have control over the applicant entity and, in the event the application is granted, would have control over the future LPFM station. Anyone who engages in application fraud is subject to significant legal sanctions, including forfeitures, application dismissals and license revocations.

## 47 C.F.R. § 73.3520 Multiple Applications

Where there is one application for a new or additional facilities pending, no other application for new or additional facilities for a station of the same class to serve the same community may be filed by the same applicant, or successor or assignee, or on behalf of, or for the benefit of the original parties in interest. Multiple applications may not be filed simultaneously.

## FACTS AND PROCEDURAL HISTORY

**I.    Low Power FM Radio Licenses**

The FCC offers a special class of local radio licenses called Low Power FM Radio (LPFM) in order to "provide opportunities for new voices to be heard." *In re Creation of Low Power Radio Service*, Report and Order, 15 FCC Rcd 2205, 2206 ¶ 1 (2000). The Commission has delegated its authority in matters pertaining to broadcast radio to the Media Bureau, which oversees the LPFM licensing program. 47 C.F.R. § 0.61; 47 C.F.R. § 0.283.

To qualify for an LPFM license, an entity must be a nonprofit educational organization that will use the proposed station to advance an educational program, a state or local government or non-government entity that will provide non-commercial public safety radio services, or a tribal applicant that will provide non-commercial radio services. 47 C.F.R. § 73.853(a). In addition, applicants for LPFM licenses must be based in the community in which they intend to broadcast. 47 C.F.R. § 73.853(b).

The FCC is required to issue Public Notices to specify a filing window for LPFM applications. 47 C.F.R. § 73.870(b). If there are conflicting LPFM applications in the same area, the Media Bureau publicly identifies them as "mutually exclusive applications" or "MX" applications. *See e.g., Media Bureau Identifies Mutually Exclusive Applications Filed in the LPFM Window and*

4

*Announces 60-Day Settlement Period; CDBS is Now Accepting Form 318 Amendments*, Public Notice, 28 FCC Rcd 16,713 (2013) (hereinafter "*Mutually Exclusive Applications Public Notice*").  The Media Bureau then opens a 60-day "settlement period" during which "MX applicants may resolve technical conflicts through three methods—technical amendments, settlements and time-share agreements." *Id.* at 16,713.

If the mutually exclusive applicants do not resolve their conflicts during this period, the Commission will award points to each applicant based on the strength of its application.  An applicant will receive one point for each of the following: (a) presence in the community for at least two years; (b) a pledge to originate locally at least 8 hours of programming per day; (c) a pledge to maintain a publicly accessible main studio at least 20 hours per week; (d) making both the local program origination and main studio pledges; (e) diversity of ownership (i.e., an applicant must hold no attributable interests in any other broadcast station); and (f) a tribal applicant that intends to transmit on tribal lands.  47 C.F.R. § 73.872(b).  In the Commission's Tentative Selectee Public Notice, the applicant with the most points is designated the tentative recipient of the construction permit.

If multiple mutually exclusive applications have the same point total, the Commission will announce the tie and designate all of the tied entities as the tentative recipient of construction permits.  This triggers a process whereby any

5

two or more of the tied applicants may submit a proposal to share the frequency that includes the proposed hours of operation of the time-share proponents. 47 C.F.R. § 73.872(c). Such a time-share proposal allows its proponents to aggregate their awarded points. *Id.*[2] Thus, at this stage, groups that enter into time- and points-sharing agreements may break the tie and receive the license.

If a tie is still not resolved through voluntary time-sharing arrangements and point aggregation, the Commission will review the tied applicants for acceptability and applicants with tied, grantable applications will be eligible for a license. 47 C.F.R. § 73.872(d). If the mutually exclusive group has three or fewer tied, grantable applications and the parties do not reach a voluntary time-sharing agreement, the Commission will assign an equal number of hours per week to each applicant. 47 C.F.R. § 73.872(d)(2). Groups of more than three tied, grantable applications will not be eligible for licensing and the Commission will dismiss all but the three applicants that have been local for the longest uninterrupted periods of time. 47 C.F.R. § 73.872(d)(3).

---

[2]   In contrast, "point aggregation procedures will not apply to time-share agreements submitted prior to the release of the pertinent Tentative Selectee P[ublic] N[otice]." *Media Bureau Provides Further Guidance on the Processing of Form 318 Applications Filed in the LPFM Window*, Public Notice, 28 FCC Rcd 16,366, 16,368 (2013).

## II.    The LPFM Applications and Media Board Proceeding

Appellant Esperanza is a Philadelphia-based 501(c)(3) community development corporation.  Esperanza submitted an application for an LPFM license during the October 2013 filing window.  JA 86-97.  So did G-Town Radio ("G-Town"), JA 49-61, Germantown United Community Development Corporation ("Germantown United"), JA 35-48, Germantown Life Enrichment Center ("Germantown Life"), JA 19-34, (collectively "Germantown Applicants"), Historic Germantown Preserved ("Historic Germantown"), JA 62-75, the South Philadelphia Rainbow Committee, JA 98-108, and the NAACP Social Justice Law Project, JA 76-85.

The Commission's Media Bureau determined that Esperanza's application, as well as the six entities listed above, were mutually exclusive and identified them as LPFM MX Group 304.  *Mutually Exclusive Applications Public Notice*, 28 FCC Rcd 16,713.  In its Order, the Media Bureau invited applicants to resolve conflicts through technical amendments, settlements, and time-share agreements, but "remind[ed] applicants that point aggregation procedures will not apply to time-share agreements submitted prior to identification of the tentative selectees in a MX group."  *Id.* at 16,714.

On September 5, 2014, the Commission determined that the seven applicants discussed above in LPFM MX Group 304 each received five points.  *Commission*

7

*Identifies Tentative Selectees in 111 Groups of Mutually Exclusive Applications
Filed in the LPFM Window; Announces a 30-Day Petition to Deny Period and a
90-Day Period to File Voluntary Time-Share Proposals and Major Change
Amendments*, Public Notice, 29 FCC Rcd 10,847 (2014) (hereinafter "*Tentative
Selectee Public Notice*"), at JA 109.[3]   The Commission designated the seven
applicants as tentative selectees of LPFM MX Group 304 on a time-share basis,
began a 30-day period for filing petitions to deny, and began 90-day periods in
which the applicants could file time-share agreements in order to resolve their
mutual exclusivities.  *Tentative Selectee Public Notice*, 29 FCC Rcd at 10,847.
The Order explained that "[i]f the applicants do not enter into a voluntary time-
sharing agreement, the Commission will assign involuntary time-sharing
arrangements to not more than three of the tied applicants in each MX group."  *Id.*
at 10,852.  On the other hand, "[t]he Commission will aggregate the point totals of
applicants that submit acceptable time-share proposals for the purpose of breaking
a tie within a mutually exclusive group."  *Id.*

On October 4, 2014, Esperanza filed petitions to deny the applications of the
Germantown Applicants and Historic Germantown.  Esperanza argued that these
entities violated the Commission's Multiple Applications Rule in 47 C.F.R.
§ 73.3520, which provides that "[m]ultiple applications may not be filed

---

[3] An eighth applicant in LPFM MX Group 304, the Inge Davidson Foundation,
received four points. *Tentative Selectee Public Notice*, 29 FCC Rcd at 10,857.

simultaneously" "on behalf of" an applicant.  Specifically, Esperanza argued that G-Town explicitly directed the other three parties to file their applications so that these multiple applications could then be combined for G-Town Radio's benefit. JA 127.  Esperanza alleged that "prior to the submission of their original applications . . . , these organizations entered into an intentional and explicit agreement to file multiple separate applications . . . for the express purpose of positioning themselves to later join their applications, aggregate their points, and block competitors." *Id.*

In support of this allegation, Esperanza submitted a declaration from Anthony Jackson, the Executive Director of the Social Justice Law Project of the Philadelphia NAACP.  JA 132.  Jackson stated in his declaration that he spoke to "the authorized representative of G-Town Radio, to discuss avenues for collaboration and possible timeshare arrangements," but the G-Town representative "made it clear that he is not willing to meet or to otherwise discuss any timeshare arrangement or partnership with any organizations other than the additional three Germantown-based entities." *Id.*  Jackson also stated that he spoke to directors of Historic Germantown and Germantown Life who "acknowledged that they originally submitted applications for LPFM construction permits at the direction of G-Town Radio" and "had no prior interest in or intention to submit applications" but "were approached by G-Town Radio and asked to submit

9

applications that would then be joined as a timeshare group after the first round of submissions was complete." *Id.*

In addition to the Jackson declaration, Esperanza noted that each applicant's proposed studio location is the one belonging to G-Town Radio and that each applicant's proposed broadcast antenna coordinates are the same. JA 128. In short, Esperanza alleged that "these organizations colluded to enter into a partnership agreement and establish a point-aggregation strategy prior to the submission of their original applications that undermined the fair process for all other organizations who applied in good faith." JA 129.

The Germantown Applicants filed an opposition to Esperanza's petitions to deny. JA 134. They argued that the Multiple Applications Rule does not apply to them and that "the Commission has no express or implied prohibition on organizations sharing resources or forming an aggregation strategy when applying for an LPFM license." JA 142-43. Indeed, the Germantown Applicants explained that they "recognized their best chance" of receiving an LPFM permit "was by working together at the outset with plans to potentially aggregate points during the Mutually Exclusive ('MX') stage so that they might share time on a single station." JA 140.

In reply, Esperanza argued that the Germantown Applicants and Historic Germantown violated the Multiple Application Rule by improperly submitting

10

separate applications with the understanding that they would agree to share time later, noting that Bill Lake, Chief of the Media Bureau, explained in a post on the FCC's Official Blog that:

> multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with a prior understanding that the groups will later share time or ownership with each other if just one applicant succeeds in getting a construction permit. If this prior understanding does exist, then all the applicants must be listed as parties to the application, and only one application can be filed (our rules only allow for one application per organization).

FCC Statement at JA 16.

On December 3, 2014, the Germantown Applicants and South Philadelphia Rainbow Committee filed a timeshare agreement with the Commission. JA 167

The Media Bureau denied Esperanza's petitions to deny. JA 184-91. It found that the Germantown Applicants and Historic Germantown violated no Commission rules in coordinating their applications with the intention of filing a joint time-share agreement. JA 187. Contrary to Esperanza's argument, the Media Bureau found that the FCC Statement "specifically approved of such [coordination] agreements." *Id.* The Media Bureau also asserted that "it is well established that informal staff advice is not authoritative and is relied on by applicants at their own risk." JA 187 n.21. The Media Bureau further found that Esperanza had not demonstrated that the entities' applications were filed for the

benefit of G-Town.  JA 187.  It ultimately held that "there is no Rule prohibiting LPFM applicants from filing separate applications with the goal of arriving at a timeshare agreement, provided that each applicant remains under separate control and intends to construct and operate the proposed station if its application is granted."  JA 188.  The Media Bureau granted the applications of G-Town, Germantown United, Germantown Life, and South Philadelphia Rainbow Committee and dismissed the applications of Historic Germantown, Nueva Esperanza, and the NAACP Social Justice Law Project.  JA 185.

Esperanza and the NAACP Social Justice Project filed a petition for reconsideration, JA 192, which the Media Bureau denied, JA 214.  The Media Bureau held that the FCC Statement did not represent a formal statement of agency policy and could not "be properly understood as pertaining to the aggregation issue" that Esperanza raised.  JA 217.

Esperanza filed an application for review to the Commission, JA 220, which the Germantown Applicants opposed, JA 231.

## III.    The FCC's Order Under Review

On December 3, 2015, the Commission issued its Memorandum Opinion and Order, which is the underlying decision in this appeal.  JA 237.  The Commission denied Esperanza's application for review "for the reasons stated in the *Staff Decision* and the *Reconsideration Decision*."  JA 238.  It held that

"[n]either the Rules nor the LPFM Blog Post prevented the Germantown Applicants from agreeing to aggregate their comparative points prior to filing their applications." *Id.* Moreover, the Commission held, "the LPFM Blog Post is informal staff advice and not authoritative." *Id.*

On December 30, 2015, Esperanza filed a timely notice of appeal.

## STANDARD OF REVIEW

This Court must set aside the FCC's determination if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although an agency's interpretation of its own regulation is entitled to deference, that deference only applies when (1) the language of the regulation in question is ambiguous; (2) "there must be 'no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question'"; and (3) the agency's reading of the regulation must be fairly supported by the text of the regulation itself. *Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

Even when an agency's interpretation receives *Auer* deference, "it is the court that ultimately decides whether a given regulation means what the agency says." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1208 n.4 (2015). That is because "*Auer* deference is not an inexorable command in all cases." *Id.* Deference is not warranted "if the interpretation is plainly erroneous or

inconsistent with the regulation." *Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 311 (D.C. Cir. 2014) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

This case turns on the proper interpretation of the FCC Statement. Esperanza was shut out of the chance to receive an LPFM license by the Germantown Applicants' pre-existing agreement to share points—an agreement prohibited by the clear language of the FCC Statement. The Commission held below that the FCC Statement did not prohibit the Germantown Applicants' conduct and that, at any rate, the Statement was not binding. The Commission was wrong on both counts.

Preexisting agreements to share points are prohibited by the clear language of the FCC Statement, which states that "multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with the prior understanding that the groups will later share time or ownership with each other if just one applicant succeeds in getting a construction permit." JA 17.

The Media Bureau nevertheless concluded that Germantown Applicants did not violate the Statement. The Media Bureau reasoned that because the Statement prohibits prior agreements to later share time "if just one applicant succeeds in getting a construction permit," it did not apply here because multiple applicants

14

succeeded in getting the permit.  That myopic view results in an irrational interpretation of the Statement.

First, the relevant paragraph of the FCC Statement explains the Commission's overarching concern: it does not want multiple groups applying "with a prior understanding that the groups will later share time" *so as to* "maximize the chances of receiving an LPFM construction permit."  JA 17.  But when "just one applicant succeeds in getting a construction permit" there is no way for a prior agreement between the parties to "maximize the chances of receiving an LPFM construction permit."  In such a situation, the single winning party that has succeeded in receiving the construction permit has done so by virtue of the strength of its own application.

Second, the scenario posited by the Media Bureau—where multiple groups apply with a prior understanding to share time where only one applicant eventually succeeds in getting the permit—is so remote as to border on the non-existent.  This is because the applicants know how many points they will receive, and they know how many points their competitors will receive.  Thus, any "one applicant" with the strongest application who will ultimately be awarded the license will have no incentive to enter into an agreement to share time with other (non-winning) entities.

The FCC's interpretation cannot possibly be correct because it is at odds with the regulatory structure as a whole. In contrast, Esperanza's interpretation is fully consistent with this regulatory scheme. The FCC Statement's ban on preexisting points-sharing agreements is consistent with the Multiple Applications Rule, which provides that "[m]ultiple applications may not be filed simultaneously" "on behalf of" an applicant, 47 C.F.R. § 73.3520, and with the LPFM regulatory regime as a whole, which explicitly allows for points-sharing only when there is a tie among mutually exclusive LPFM applications. The ban on preexisting points-sharing also discourages gamesmanship, an important goal of the LPFM process, and levels the playing field for a strong applicant like Esperanza that applies in good faith, to ensure that applicant is not shut out of the process.

The very facts of this case illustrate the gamesmanship that the FCC Statement was meant to protect against—prior to the submission of their original applications for the construction permit, G-Town Radio, Historic Germantown , Germantown Life, and Germantown United entered into an agreement to file multiple separate applications for the LPFM construction permit for the express purpose of positioning themselves to later aggregate their points and block competitors. Indeed, had winning entities not pre-arranged to aggregate their points, Esperanza could have had a chance at negotiating its way into that group.

16

Such a wait-and-see regime encourages a robust negotiating period, in which applicants respond to other independent applicants who are tied for the license and the parties are incentivized to discuss broadly the possibility of aggregating points, and it avoids the type of gamesmanship through which the parties can prearrange to subvert an open negotiating process, thus furthering the public interest in hearing from a wide array of strong, independent, community voices.

Nor can the decision below be defended on the ground that the FCC was free to ignore the Statement. To the contrary, the FCC Statement was authoritative and binding and Esperanza was entitled to rely on it. An agency pronouncement is considered binding if it "appears on its face to be" so. *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). That standard is easily met here, as the FCC Statement uses mandatory language targeted at LPFM applicants and appears on the FCC's Official Website under the authorship of Bill Lake, Chief of the Media Bureau. This Court has recognized that, without checks, agencies' release of guidance on the Internet can subvert the notice and comment process and judicial review.

Finally, to the extent the Commission's interpretation was correct (and it was not), the Commission failed to provide Esperanza with fair notice of its meaning in violation of Esperanza's due process rights. Thus, this Court should

reverse the Commission's order and remand to the Commission with instructions to grant Esperanza's application for review.

## STANDING

In the Order below, the FCC rejected Esperanza's application to construct an LPFM radio station in Philadelphia, Pennsylvania, upholding a Media Bureau order granting the construction permit to a separate group of applicants under the FCC's voluntary time share and point aggregation rules. *See* 47 C.F.R. § 73.872(c). Esperanza is an aggrieved party who fully participated in the proceedings that led to the Order and is bound by the FCC's determination. Esperanza seeks review on the grounds that the Order is contrary to law, clearly erroneous, arbitrary and capricious, an abuse of discretion, and not supported by substantial evidence. Esperanza respectfully requests that this Court hold unlawful, vacate, enjoin, set aside and/or remand the Order, and grant such further relief as may be deemed just and proper.

## ARGUMENT

**I.    The Text, Structure, and Purpose of the FCC Statement All Clearly Establish That It Prohibits the Germantown Applicants' Pre-Award Collusion to Share Points.**

### A. The FCC Statement Expressly Prohibits the Conduct At Issue.

The FCC Statement draws a clear line:  Although parties may apply for an LPFM license with an idea that they may later decide to agree to share time and

aggregate points, they may not apply with a prior arrangement between applicants to do so.  Aggregating points is an accepted part of the LPFM licensing process, but only *after* points are awarded.  Because the Germantown Applicants have conceded they "work[ed] together at the outset with plans to potentially aggregate points during the Mutually Exclusive ('MX') stage so that they might share time on a single station," JA 140, those Applicants violated the Commission's rules as reflected in the FCC Statement.  The Commission's Order to the contrary must be vacated.

The text of the FCC Statement is express that the parties may not apply for an LPFM license with a preexisting agreement to share points:  "multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names *with a prior understanding that the groups will later share time*."  JA 17 (emphasis added).  In other words, applicants may not apply for a license with a preexisting agreement to share time and points.

In contrast, the FCC Statement allows organizations in a community to apply separately "knowing that they *may decide later* to aggregate points . . . if the Commission determines that they are tied with the highest point total in the same mutually exclusive group."  *Id.* (emphasis added).  This language explains that parties are obviously allowed to *know* that the LPFM licensing regime allows for

19

aggregation of points upon the awarding of tied point totals to multiple applicants. But the FCC Statement describes the aggregation of points as something the parties *may decide to do* in the future; it is not something that they may have already agreed to. Simply put, the clear text of the FCC Statement prohibits the type of pre-existing agreement to share points that was at issue in this case.

Here, the Germantown Applicants have conceded they "work[ed] together at the outset with plans to potentially aggregate points during the Mutually Exclusive ('MX') stage so that they might share time on a single station." JA 140. They did so by agreeing to file multiple separate applications for the LPFM construction permit to position themselves to later aggregate their points and block competitors. JA 127. Those Applicants violated the Commission's rules as reflected in the FCC Statement.

## B. The Commission's Interpretation of the FCC Statement Is Irrational.

The Commission's attempt to make the FCC Statement say something other than what is says has no merit. Although an agency is generally entitled to deference in interpreting its rules, that deference only applies when the language of the rule in question is ambiguous, the interpretation "reflect[s] the agency's fair and considered judgment on the matter in question," and the agency's reading is "fairly supported by the text." *Drake*, 291 F.3d at 68 (internal quotation marks omitted). That standard is not met here.

The Media Bureau selectively focuses on one particular clause in the FCC Statement—that "multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with a prior understanding that the groups will later share time . . . if just one applicant succeeds in getting a construction permit." JA 17. The Media Bureau concluded that the "if just one applicant succeeds in getting a construction permit" clause demonstrates that this prohibition does not apply to a situation in which different entities are tied and points may be aggregated; rather, it applies to a situation in which a single applicant receives the most points and, thus, the license. JA 187 n.21; JA 217.

But this interpretation cannot possibly be correct. *First*, the relevant paragraph of the FCC Statement explains the Commission's overarching concern: it does not want multiple groups applying "with a prior understanding that the groups will later share time" *so as to* "maximize the chances of receiving an LPFM construction permit." JA 17. But when "just one applicant succeeds in getting a construction permit" there is no way for prior agreement between the parties to "maximize the chances of receiving an LPFM construction permit." *Id.* In such a situation, the single winning party that has succeeded in receiving the construction permit has done so by virtue of the strength of its own application; it wins because it receives more points than its competitors. No prior arrangement to share time

21

with weaker applicants would have "maximized [its] chances" of being awarded the license.  Nor could the losing parties have maximized their "chances of *receiving an LPFM construction permit*" when, per the Commission's hypothetical, only the single winning applicant has received the permit.  In short, neither party's chances of receiving a permit has changed as a result of this time-sharing agreement.

*Second*, the scenario posited by the Media Bureau—where multiple groups apply with a prior understanding to share time where only one applicant eventually succeeds in getting the permit—is so remote as to border on the non-existent.  This is because the applicants know how many points they will receive, and they know how many points their competitors will receive.[4]  Thus, any "one applicant" with the strongest application who will ultimately be awarded the license from the Commission will have no incentive to enter into an agreement to share time with

---

[4] Specifically, and as described above, the awarding of points is a mechanistic process.  There is no discretion or weighing of applicants involved—an applicant receives one point for two years in the community; three points for pledging to originate locally a certain amount of programming and to maintain a publicly-accessible studio for a certain number of hours per week; a fifth point for diversity of ownership; and a sixth point for tribal entities.  Thus, each party knows—based on its application—how many points it will be ultimately awarded.  During this process the parties also know the identities and number of all their competitors and are able to estimate how many points their competitors will receive—an entity can assume a competitor will receive three pledge points and should be able to easily determine whether another applicant has existed for two years in the community, has diversity of ownership, and has tribal affiliation points through publicly-accessible information.

22

other (non-winning) entities, as it would have been easy to determine that their applications were weaker and that it could win itself outright.

Thus, this interpretation of the FCC Statement is plainly at odds with what it says. The FCC Statement states clearly that parties may not agree to share time in order to maximize the chances of receiving an LPFM permit, and this concern does not even apply to situations in which one applicant succeeds in getting a construction permit. The Commission's concern expressed in the FCC Statement is a real one, and it applies with force in the situation presented by this case: Where the parties agree, before points are awarded—indeed, in this case before they have even filed applications—that they will share time and aggregate their points, they "maximize the chances of receiving an LPFM construction permit" and unfairly rig the application process in their favor. That is just what the Germantown Applicants did here.

In sum, because the FCC Statement is not ambiguous and the Commission's interpretation "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it is arbitrary and capricious and must be rejected. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Commission has failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371

23

U.S. 156, 168 (1962)). Therefore, the Court should recognize that Esperanza's interpretation is the only one that can be correct.

### C. Esperanza's Interpretation Is the Only One that Makes Sense of The Regulatory Scheme.

The FCC's interpretation cannot possibly be correct because it is at odds with the regulatory structure as a whole. In contrast, Esperanza's interpretation is fully consistent with the regulatory scheme for the following reasons.

*First*, the FCC Statement's prohibition on preemptive points-sharing stems from—and is consistent with—the Commission's Multiple Applications Rule in 47 C.F.R. § 73.3520, which provides that "[m]ultiple applications may not be filed simultaneously" "on behalf of" an applicant. If multiple applicants have a pre-application agreement to share points, they are effectively applying "on behalf of" the same applicant. This is the case with the Germantown Applicants here.

*Second*, the FCC Statement's prohibition on preemptive points-sharing is consistent with the LPFM regulations. Those regulations provide that "[*i*]*f mutually exclusive applications have the same point total*, any two or more of the tied applicants may propose to share use of the frequency" and those "time-share proponents' points will be aggregated." 47 C.F.R. § 73.872(c); *see also* Instructions for FCC Form 318, at 9, https://transition.fcc.gov/Forms/Form318/318.pdf ("If a tie among mutually exclusive LPFM applications remains *after* the Commission conducts a points

24

analysis, the Commission offers the tied applicants the opportunity to enter into a voluntary time-share agreement" (emphasis added)).  These regulations make clear that the Commission endorses agreements among applicants to share points only *after* the Commission has awarded the points in question.

*Third*, the Commission has recognized "discouraging gamesmanship" is an important goal of the LPFM application process, and the FCC Statement's ban on preexisting agreements furthers that goal.  *See In re Creation of a Low Power Radio Service*, Fifth Order on Reconsideration and Sixth Report and Order, 27 FCC Rcd 15,402, 15,460 ¶ 162 (2012).  The Commission has explained that it is "cognizant of the potential for gamesmanship in the voluntary timesharing process," but believes that this risk was mitigated by the Rules under which the LPFM voluntary timesharing process is administered.  *Id.* at 15,474 ¶ 195.  The FCC Statement, which prohibits pre-arranged point-sharing agreements, is one such rule.

The facts of this case, in particular, highlight why the FCC Statement's ban on pre-arranged points sharing is critical to avoiding gamesmanship.  As Esperanza laid out in its petition to deny before the Media Bureau, there was substantial evidence in this case to believe that G-Town Radio explicitly directed Historic Germantown, Germantown Life, and Germantown United to file their LPFM applications so that their points could later be aggregated.  JA 127-29.  In other

25

words, "these organizations entered into an intentional and explicit agreement to file multiple separate applications for the LPFM construction permit for the express purpose of positioning themselves to later join their applications, aggregate their points, and block competitors." JA 127. By stacking the deck in their favor, the Germantown Applicants subverted the open application period and virtually ensured they would win the license from the outset. The gamesmanship apparent in this case illustrates why the FCC Statement prohibits this very conduct.

*Fourth*, the prohibition on pre-arranged point-sharing increases the likelihood that the strongest applicants ultimately receive the license. When the Commission issues a Mutually Exclusive Public Notice and identifies the mutually exclusive applications, it has not yet made either acceptability or grantability determinations regarding the applications. *See Mutually Exclusive Application Public Notice*, 28 FCC Rcd at 16,713. To illustrate, although seven entities in the instant MX group ultimately received five points each and tied, there were originally four other applicants in that group who were not awarded points. *Compare id.* at 16,715 (group 304) *with Tentative Selectees Public Notice*, 29 FCC Rcd at 10,857 (same). By creating a rule that prohibits point-sharing until points are awarded, the Commission ensures that only the most competitive applicants— i.e., those tied with the highest point value—will end up receiving time on the air. Indeed, the Commission has explained (emphatically) that "***Only those applicants***

26

***tied for the highest point total in an MX Group may enter into a time-sharing agreement and aggregate their points.***"  *Mutually Exclusive Application Public Notice*, 28 FCC Rcd at 10,852.  This scheme gives *all* of the tied entities a shot at teaming up with others to amass the most aggregated points, and is consistent with the Commission's goals of "provid[ing] opportunities for new voices to be heard" and "authoriz[ing] facilities in a manner that best serves the public interest."  *In re Creation of Low Power Radio Service*, 15 FCC Rcd at 2206 ¶ 1.

*Finally*, the rule barring prior agreements to share points levels the playing field for a strong applicant like Esperanza that applied in good faith, to ensure that applicant is not shut out of the process.  Specifically, had the Germantown Applicants not pre-arranged to aggregate their points, Esperanza could have had a chance at negotiating its way into that group.  Such a wait-and-see regime encourages a robust negotiating period, in which applicants respond to other independent applicants who are tied for the license and the parties are incentivized to discuss broadly the possibility of aggregating points, and it avoids the type of gamesmanship—as apparent in this case—through which the parties can prearrange to subvert an open negotiating process.[5]

---

[5] Take for example the following two hypotheticals.  In each scenario there are ten applicants that apply for mutually exclusive licenses.  Each will receive five points. In the first scenario, in which prior agreements to share points are allowed, six entities have prearranged to share their points.  When they are each awarded their five points, their points are aggregated per the prior agreement for a total of thirty

In sum, the FCC Statement can only be read as a ban on prior point-sharing agreements. Such a reading is consistent with the Multiple Applications Rule and the LPFM regulatory regime as a whole, prevents gamesmanship, and furthers the public interest in hearing from a wide array of strong, independent, community voices.

## II. The FCC Statement Was Authoritative and Binding and Esperanza Was Entitled to Rely on It.

The FCC Statement was authoritative and binding, as such, Esperanza had reason to rely on it. An agency pronouncement is considered binding if it "appears on its face to be" so. *General Electric*, 290 F.3d at 383. That standard is easily met here, as the FCC Statement uses mandatory language targeted at LPFM applicants and appears on the FCC's Official Website under the authorship of Bill Lake, Chief of the Media Bureau. This Court has recognized that, without checks, agencies' release of guidance on the Internet can subvert the notice and comment

points. Even if the four other entities were able to band together, they would have a total of only twenty points and the prearrangers would receive the license. None of the four out-groups would have had an opportunity to compete to join the winning cabal, as that group would have no incentive to add additional members.

Compare that with a second scenario, in which prior point-sharing agreements are barred. In this situation, after the Commission awards five points to each entity all ten groups are in the identical position—they must all scramble and negotiate to create an alliance with the most total points. No entity starts with any advantage or disadvantage over any other. In this situation, the process is transparent and all of the competitive applicants begin the negotiating process on a level playing field.

process and judicial review. Holding the FCC Statement represented an authoritative agency interpretation would supply one such check.

This Court has drawn a line between, on the one hand, legislative rules, which are binding, and policy statements or interpretive rules, which are not. *See id.* at 382. Binding legislative rules are generally those that have been (or should have been) promulgated through notice and comment procedures, but this Court has "also recognized that an agency's other pronouncements can, as a practical matter, have a binding effect." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020-21 & n.11 (D.C. Cir. 2000). In drawing the line between binding legislative rules and nonbinding statements of policy or interpretive rules, the critical question is "whether the agency action binds private parties or the agency itself with the force of law." *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (quoting *General Electric*, 290 F.3d at 382). "[A]n agency pronouncement will be considered binding, . . . as a practical matter if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding." *General Electric*, 290 F.3d at 383 (citations omitted). Indeed, "the mandatory language of a document alone can be sufficient to render it binding":

> A document will have practical binding effect before it is actually applied if the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences such as . . . denial of an application. If the document is couched in mandatory language, or in terms indicating that it will be regularly applied, a binding intent is strongly evidenced. In some circumstances, if the language of the

> document is such that private parties can rely on it as a norm or safe
> harbor by which to shape their actions, it can be binding as a practical
> matter.

*Id.* (quoting Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances,*

*Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*,

41 Duke L.J. 1311, 1328-29 (1992)).

Here, the mandatory language used in the FCC Statement and aimed at

regulated entities indicates its authority.   The FCC Statement was issued in

anticipation of the LPFM filing window and was clearly targeted at prospective

applicants for LPFM licenses, as it included "reminders and highlights on a

number of important issues" such as "don't forget you can start filling out your

Form 318 application online *now*!"  JA 16.  It mandates what must be allowed—

the Commission "*will permit* organizations in a community to work together to file

a single . . . application," or, "[a]lternatively, organizations in a community *could*

apply separately . . . knowing that they may decide later to aggregate points."  JA

16-17 (emphases added).   It also includes proscriptions: "it is the *specified*

applicant on the application who *must* intend to carry out station construction and

operation," and "multiple groups *should not* attempt to maximize the chances of

receiving an LPFM construction permit by submitting multiple applications . . .

with a prior understanding that the groups will later share time."  JA 17 (second

and third emphases added).  Moreover, "[i]f this prior understanding does exist,

then all the applicants *must* be listed as parties to the application." *Id.* (emphasis added)  That is because "[t]he FCC *requires* applicants to be truthful when listing parties that have control over the applicant entity." *Id.* (emphasis added).

Thus, "the entire [FCC Statement], from beginning to end . . . reads like a ukase.  It commands, it requires, it orders, it dictates." *Appalachian Power*, 208 F.3d at 1023.  "This clear and unequivocal language . . . creates a binding norm" that regulated entities are required to follow.  *CropLife America*, 329 F.3d at 881 (internal quotation marks omitted); *see also MetWest Inc. v. Sec'y of Labor*, 560 F.3d 506, 509-10 (D.C. Cir. 2009) (whereas "conditional or qualified statements, including statements that something 'may be' permitted, do not establish definitive and authoritative interpretations," "express, direct" statements reflect an agency's authoritative position).  The FCC Statement's text makes clear that it represents "a position [the Commission] plans to follow in reviewing" LPFM applications and is "a position it will insist [applicants] comply with." *Appalachian Power*, 208 F.3d at 1022; *see also General Electric*, 290 F.3d at 384 (concluding guidance document binds applicants and the agency).  In sum, the mandatory, unequivocal language in the FCC Statement renders it a binding agency rule on which Esperanza was entitled to rely because "the commands of the [FCC Statement] indicate that it has the force of law." *Id.* at 385.

31

As a further indication of its authority, the FCC Statement was written by Mr. Lake, *the Chief* of the Media Bureau, and the Statement's byline clearly indicates Mr. Lake's position of power. JA 16; *see also* https://transition.fcc.gov/mb/mborg.pdf (Media Bureau organizational chart). The FCC Statement represents "a definitive and binding statement on behalf of the agency" that "come[s] from a source with the authority to bind the agency." *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1040 (D.C. Cir. 2008). The Media Bureau manifestly has the power to make rules on the LPFM process; it is delegated responsibility from the Commission for "develop[ing], recommend[ing] and administer[ing] the policy and licensing programs for the regulation of . . . radio[] . . . services in the United States." 47 C.F.R. § 0.61; *see also* 47 C.F.R. § 0.61(b) (Bureau tasked with "[c]onduct[ing] rulemaking proceedings concerning the legal, engineering, and economic aspects of media service"). Moreover, the Statement appeared on the FCC's Official Website, where LPFM applicants come to seek information regarding the rules that govern the application process. In short, the FCC Statement outlining rules for the LPFM licensing process, written by the Chief of the Media Bureau, and prominently displayed on the FCC's Official Website, constitutes an authoritative pronouncement on the rules LPFM applicants must follow.

32

The Statement here is akin to that in *Appalachian Power*, in which this Court acknowledged as binding guidance issued by EPA's Director of the Office of Regulatory Enforcement and Director of the Office of Air Quality Planning Standards. *See* 208 F.3d at 1019. And, because it was on the FCC's Official Website, the FCC Statement is like advice conveyed over the Commission's hotline that "the Commission . . . specifically told the public to call," and on which the Commission has recognized the public has a right to rely. *In re Applications of Steven Heft*, Hearing Designation Order, 3 FCC Rcd 6692, 6693 ¶ 10 (Video Servs. Div. 1998) (refusing to penalize applicants who relied on hotline's advice).

Agency officials manifestly have the power to create agency authority. This Court has recognized that staff advice to regulated parties may constitute an "authoritative" agency position, which parties are entitled to rely on. *See Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034-35 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015).[6] This

---

[6] *Alaska Professional Hunters* addressed the authoritativeness of the agency guidance to determine whether the agency's reversal of that policy should have been promulgated through notice and comment under this Court's *Paralyzed Veterans* doctrine, which provided that "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997). Last year, the *Paralyzed Veterans* doctrine was overturned by the Supreme Court. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015). But *Perez* did not affect the portion of *Alaska Professional Hunters* that addresses the question of the authoritativeness of agency guidance.

is especially true when the agency has not issued other clearly authoritative guidance on the issue. *See Alaska Prof'l Hunters*, 177 F.3d at 1035. Indeed, the FCC itself has acknowledged that "until such time as the Commission provides definitive guidance in [an] area, it would not be unreasonable for a [regulated entity] to rely on a prior informal staff opinion in this area." *In re Petition for Declaratory Ruling Concerning Section 312(a)(7) of Communications Act*, Memorandum Opinion and Order, 9 FCC Rcd 7638, 7639 ¶ 2 (1994), *vacated on other grounds, Becker v. FCC*, 95 F.3d 75 (D.C. Cir. 1996).

Mr. Lake's position of authority makes this situation quite different from the two cases the Media Bureau relied on in its initial Order on Esperanza's petition to deny. JA 187 n.21. Both of the cases the Bureau cited involved *incorrect* information transmitted by a single staff person whose position is unknown. *Malkan FM Associates v. FCC*, 935 F.2d 1313 (D.C. Cir. 1991), involved a "slip[]" by "an official" during a Commission seminar, which conflicted with the Commission's regulations. *Id.* at 1317. This is a far cry from the current situation, where the Chief of the Bureau issued the Commission's only pronouncement on the issue on the agency's Official Website. Likewise, *In re Application of Oregon Acting By and Through the State Board of Higher Education for the Benefit of Southern Oregon State College*, Memorandum Opinion and Order, 11 FCC Rcd 1843, 1844 ¶ 10 (1996), addressed incorrect information conveyed by a staff

person over the phone, which conflicted with information in the agency's Public Notices.

And there is nothing inherently informal about the FCC Statement's medium, or any medium for that matter.  The Bureau claims that "[b]logs are by their very nature informal writings of individuals, not formal statements of agency policy."  JA 217.  But the FCC Statement is of course not a "blog" in the usual sense of the word.  Mr. Lake was not musing about his favorite restaurants or giving fashion tips.  He provided instructions on the FCC's Official Website for applying for LPFM licenses.  This far exceeds the level of formality this Court has found constitutes a binding agency statement.  *See, e.g.*, *CropLife*, 329 F.3d at 881 (a press release can bind an agency); *Appalachian Power*, 208 F.3d at 1019-20 (same for guidance document available on an agency's website); *see also Ass'n of Am. R.R.s v. Dep't of Transp.*, 198 F.3d 944, 948 (D.C. Cir. 1999) (examining the specific wording of an email to determine whether it constituted a definitive agency's interpretation).

Finally, this Court has recognized that, without checks, agencies' release of guidance on the Internet can effectively subvert the notice and comment process and judicial review.  The dangers of this scheme were cogently highlighted by this Court in *Appalachian Power*:

> The phenomenon we see in this case is familiar.  Congress passes a broadly worded statute.  The agency follows with regulations

35

> containing broad language, open-ended phrases, ambiguous standards and the like.  Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations.  One guidance document may yield another and then another and so on.  Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities.  Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations.  With the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its web site.  An agency operating in this way gains a large advantage.  "It can issue or amend its real rules, i.e., its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures."  Richard J. Pierce, Jr., *Seven Ways to Deossify Agency Rulemaking*, 47 Admin. L. Rev. 59, 85 (1995).  The agency may also think there is another advantage—immunizing its lawmaking from judicial review.

208 F.3d at 1020 (footnote omitted).  Thus, the FCC Statement's publication on the Internet does not render it nonbinding, and this Court should look skeptically at an agency's reliance on publications on its website to create law and subvert the rulemaking process.  In short, the language of the FCC Statement and its author's position render it an authoritative pronouncement by the Commission regarding the LPFM licensing process, on which Esperanza was entitled to rely.  Thus, the Court should vacate the Order below, in which the Commission incorrectly interpreted its

Statement and arbitrarily and capriciously refused to follow the correct interpretation in this case.[7]

## III.   To the Extent the Commission's Interpretation is Correct, the Commission Failed to Provide Esperanza With Fair Notice.

If this Court finds that the Commission's interpretation was correct, and it should not, Esperanza's due process rights were violated because the Commission failed to provide fair notice of its interpretation of the FCC Statement.

In the civil administrative context, "'elementary fairness compels clarity' in the statements and regulations setting forth the actions with which the agency expects the public to comply." *General Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (quoting *Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968)). Under this doctrine, "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be [un]able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has [not] fairly notified a petitioner of the agency's interpretation." *Id.* at 1329. The fair notice doctrine can be violated even if the agency's interpretation is permissible. *Id.* at 1330.

---

[7] Esperanza takes no position on whether, to enforce the Guidance on a going-forward basis, the Commission is required to promulgate this rule through notice and comment procedures. For the purposes of this appeal, it is sufficient for this Court to hold that the Guidance was binding on the agency and third-parties and that, therefore, the Commission should have followed it in this adjudication.

The Commission's interpretation is not "ascertainably certain" from the text of the FCC Statement.  For the reasons discussed above, it was not at all clear that the Germantown Applicants—and, indeed, everyone—were allowed to apply for a license with a prearranged agreement to share points, long before before the Commission issued the Tentative Selectees Public Notice.  *See id.* at 1331 (fair notice violated where regulations in question "fail[ed] clearly to bar" the conduct in question and, indeed, "they apparently permit it").

As a result of this lack of fair notice, Esperanza was penalized by the Commission's interpretation and application of its Statement.  Had Esperanza known it was permissible to reach agreements with other parties to share points before the tentative selectees were designated, and, indeed, before applications were even submitted, Esperanza would no doubt have attempted to form alliances and negotiate point-aggregation agreements from the outset and could have negotiated itself into a winning point-aggregation and time-sharing arrangement. But because the Commission's Statement did not appear to allow this, Esperanza missed out on this crucial negotiating window.

*Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987), is instructive.  The FCC's rules contained significant ambiguity regarding where applications to operate microwave radio stations were to be filed.  *Id.* at 2. Satellite Broadcasting Company (SBC) filed its application in Washington, D.C.,

38

but the Commission later determined that it should have been filed in Gettysburg, Pennsylvania, and denied SBC's application. *Id.* SBC appealed, arguing that the FCC arbitrarily and capriciously interpreted its rules to require filing in Gettysburg and, in the alternative, that the FCC failed to provide adequate notice of where applications should be filed. *Id.* The Court "assume[d], arguendo, that the FCC's interpretation here is a reasonable one." *Id.* at 3. But, the Court observed, "if the Commission had interpreted its rules as did [SBC, the Court] similarly would have been obliged to defer to that interpretation because, at a minimum, it is also reasonable." *Id.* "There," the Court concluded, "is the rub." *Id.* "The Commission through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting Commission rules." *Id.* at 3-4. Colorfully likening the counterfactual situation to a game of "Russian Roulette," the Court observed that although the agency's interpretation is entitled to deference, "if it wishes to use that interpretation to cut off a party's right, it must give full notice of its interpretation." *Id.* at 4. The Court vacated as arbitrary and capricious the FCC's order dismissing SBC's application and remanded the case for reinstatement of the application. *Id.* As in *Satellite Broadcasting*, because Esperanza was effectively penalized by failing to follow the Commission's unclear rules, the FCC failed to afford fair notice and its affirmance of the Media Bureau's decision was arbitrary and capricious and must be vacated.

## CONCLUSION

For the foregoing reasons, Appellant Esperanza respectfully requests that this Court vacate the FCC's Order and remand to the FCC to grant Esperanza's application.

April 29, 2016                              Respectfully submitted,


                                           /s/ Matthew S. Hellman
                                           MATTHEW S. HELLMAN
                                           JOHN L. FLYNN
                                           DEVI M. RAO
                                           JENNER & BLOCK LLP
                                           1099 New York Avenue, N.W.
                                           Washington, D.C. 20001
                                           (v) (202) 639-6000
                                           (f) (202) 639-6066
                                           MHellman@jenner.com
                                           JFlynn@jenner.com
                                           DRao@jenner.com

                                           *Counsel for Nueva Esperanza, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Devi M. Rao, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7).  The brief contains 9,467 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in Times New Roman 14-point font, a proportionately spaced typeface, using Microsoft Word 2007.

April 29, 2016                                        /s/  Devi Rao
                                                      Devi M. Rao
                                                      JENNER & BLOCK LLP
                                                      1099 New York Avenue, N.W.
                                                      Washington, D.C. 20001
                                                      (202) 639-6000

## <u>CERTIFICATE OF SERVICE</u>

I, Devi M. Rao, hereby certify that on this 29th day of April, 2016, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

<u>/s/ Devi M. Rao</u>
Devi M. Rao
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Washington, D.C. 20001
(202) 639-6000